**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**
**CIVIL ACTION NO.  3:13-CV-697-DCK**

| | | |
|---|---|---|
| **OCWEN LOAN SERVICING, LLC,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | <u>**ORDER**</u> |
| | ) | |
| **FOODMAN HUNTER & KARRES,** | ) | |
| **PLLC, and JAMES W. SURANE,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

**THIS MATTER IS BEFORE THE COURT** on Plaintiff's "Motion for Partial Summary Judgment and Incorporated Brief in Support" (Document No. 47);  Defendant's "Motion to Dismiss Pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure for Lack of Subject Matter Jurisdiction" (Document No. 49);  and Defendant's "Motion for Summary Judgment" (Document No. 51).  The parties have consented to Magistrate Judge jurisdiction pursuant to 28 U.S.C. § 636(c), and these motions are now ripe for disposition.

Having carefully considered the motions, the record, and applicable authority, the undersigned will <u>grant</u> Defendant's "Motion to Dismiss…," and <u>deny as moot</u> Plaintiff's "Motion for Partial Summary Judgment …" and Defendant's "Motion for Summary Judgment" (Document No. 51).

## I.      BACKGROUND

**A.      Factual**

Dorothea and James Estes (the "Estes") executed a mortgage (the "Mortgage") in favor of Parkway Mortgage A Division of Midland National Life Insurance Company Its Successors And

Or Assigns ATIMA ("Parkway Mortgage") on August 31, 1999, to secure a promissory note (the "Note") in the amount of $145,000, and purportedly encumbering property at 3507 Burris Street, North Myrtle Beach, South Carolina 29582 (the "Property"). (Document No. 1, ¶7; Document No. 1-1; Document No. 47, p.1). The Estes executed the Mortgage before a Notary Public for South Carolina, and two witnesses, on August 31, 1999. (Document No. 1-1, p.8). Dorothea Estes, alone, executed the Note in Cornelius, North Carolina on that same date. (Document No. 1-2).

James Surane ("Surane"), a North Carolina-based attorney, and the firm Foodman Hunter & Karres PLLC ("FH&K") (together, "Defendants") were allegedly responsible for the closing of the Property.[1] (Document No. 1, ¶8; Document No. 47, ¶¶ 2-6). Prior to the closing of the loan transaction, Surane received "Loan Closing Instructions…" (Document No. 1-3) from Parkway Mortgage. (Document No. 1, p.3; Document No. 47, p.2). The instructions required Defendants, among other things, to:

> **"RECORD ALL NECESSARY DOCUMENTS AND RETURN THEM TO THE LENDER IN A TIMELY MANNER"** (emphasis in the original) and "provide written evidence that a binding mortgagee's policy of title insurance … is or will be in force and effect as of the date of closing" and provide "THE <u>AGENT AUTHORIZATION LETTER/CLOSING PROTECTION LETTER</u> FOR THIS TRANSACTION."

(Document No. 1, ¶11) (quoting Document No. 1-3). Defendants were paid $500 for "Attorney and Title Fees" in connection with the closing. (Document No. 47, ¶6; Document No. 47-7, p.4).

Defendants deny that they were the closing agents responsible for disbursing funds, filing the Mortgage in South Carolina, or providing title insurance for the closing. (Document No. 50,

---

[1] At the time of the closing in 1999, Foodman, Hunter, & Karres PLLC was known as Foodman, Surane, Hunter, Presnell, & Karres, PLLC. (Document No. 1, ¶¶8-9).

p.3) (citing Document No. 50-2, pp.3-4).  Instead, Defendants contend that the closing service they provided was likely a "witness closing."  (Document No. 50, pp.3-4).  Neither Defendant Surane, nor his former firm FH&K, possess any files regarding the closing because the North Carolina State Bar only requires attorneys to keep files for six (6) years, and the underlying transaction occurred in 1999—almost fourteen (14) years prior to this lawsuit being filed.  (Document No. 50, p.3).

Plaintiff's counsel, Michael Griffin ("Griffin"), acknowledged at a hearing that Defendants had contacted the Van Osdell Lester Howe & Jordan law firm (the "Lester Firm") in South Carolina related to the underlying transaction.  Mr. Griffin noted that the Lester Firm had a HUD form with information related to the Estes, but there is no evidence that shows that the Lester Firm ever received any disbursements, money, or any attorney's fees related to the Estes closing. Exhibit D to the Complaint is a "Commitment For Title Insurance" that is signed by Richard E. Lester, and appears to have been faxed between the Lester Firm, Defendants, and Parkway Mortgage on September 13, 1999 and/or September 29, 1999.  (Document No. 1-4);  see also (Document No. 1, ¶12).

Defendants note that Mr. Estes testified that he traveled to a South Carolina attorney's office for an appointment to close the loan in question, but when he arrived, the loan documents were not ready.  (Document No. 50, p.3-4) (citing Document No. 50-3, p.3).  Instead of returning to South Carolina, Mr. Estes testified that he executed the loan documents in North Carolina, either at his home or at an office.  (Document No. 50, p.4) (citing Document No. 50-3, p.4-5).

The original address on the Mortgage (Document No. 1-1), 3405-B Burris Street, North Myrtle Beach, S.C. 29582, 3405 B, was scratched out and replaced with the handwritten notation "3507," initialed by the Estes. (Document No. 1, ¶7;  Document No. 1-1, p.3).  On other relevant

documents, such as the "Note" (Document No. 1-2), the "Loan Closing Instructions…" (Document No. 1-3), the HUD-1 Settlement Statement (Document No. 47-7), and the "Assignment of Mortgage" (Document No. 52-6), the address of the subject property is 3405-B Burris Street.

Parkway Mortgage immediately assigned the Mortgage to Flagstar Bank on August 31, 1999. (Document No. 50, p.5; Document No. 52-6). Notably, the "Assignment Of Mortgage" (Document No. 52-6, pp.2-3), executed by two officers of Parkway Mortgage appearing before a Notary Public of New Jersey, leaves *blank* any information regarding the recording of the underlying Mortgage, and as noted above, identifies the wrong property allegedly securing the Mortgage being assigned. (Document No. 52-6, p.2). It is not alleged that Defendants had any responsibility for, or involvement in, the assignment of the Mortgage from Parkway Mortgage to Flagstar Bank. (Document No. 1).

The Mortgage was allegedly transferred to the Federal Home Loan Mortgage Corporation ("Freddie Mac") in or about 2004, although the Complaint does not provide a date, or any documentation or other information regarding that transaction or exactly what interests were transferred. (Document No. 1, ¶14; Document No. 52, p.5). Plaintiff's representative, Katherine Ortwerth, testified that she did not know when ownership of the underlying loan/mortgage transferred to Freddie Mac and that she had not seen any documents that transferred the ownership or assigned the ownership of the loan from Flagstar Bank to Freddie Mac. (Document No. 52-7, pp.3-4). Apparently, GMAC Mortgage LLC ("GMACM") obtained rights to service the Mortgage at some point, but the Complaint also lacks any explanation for how or when that occurred, or what if any actions GMACM took to service the Mortgage. See (Document No. 1, ¶14, n.1).

On or about August 9, 2005, the Estes sold the Property to a third party - Brian and Leigh Ann Holts (the "Holts") - without written consent of the Lender.[2]  (Document No. 47, ¶12). However, oddly enough, the Estes continued to make payments on the mortgage loan until about May 2010. (Document No. 1, ¶15;  Document No. 47, ¶13).  Mr. Estes testified that because "[w]e were doing a lot of business," he kept making payments on the Mortgage until 2010, even though he sold the Property allegedly securing the Note/Mortgage in August 2005.  (Document No. 50, p.6;  Document No. 52-3, p.6).  Once the Estes realized the Property was sold, they ceased payments on the underlying obligation.  (Document No. 47, ¶13).

According to the Complaint, Ocwen Loan Servicing, LLC ("Plaintiff" or "Ocwen") currently has rights to service the loan.  (Document No. 1, ¶14).  The Complaint specifically alleges that the "Estes missed the payment due on May 1, 2010 and **Ocwen** subsequently referred the loan to foreclosure to recoup its losses."  (Document No. 1, ¶15) (emphasis added).  "**Counsel for Ocwen** obtained a title search for both 3507 Burris Street and 3405 B Burris Street" on or about August 6, 2010, and neither revealed a recorded version of the Mortgage.  (Document No. 1, ¶¶16-18;  Document No. 47, ¶ 14) (emphasis added).  The search did reveal that the Estes never owned the property located at 3405 B Burris Street, and that a third party possessed the property at 3507 Burris Street.  (Document No. 1, ¶¶17-18).  Furthermore, Plaintiff's counsel was unable to locate a Title Policy and a Closing Protection Letter.  (Document No. 1, ¶19).

The Complaint does not allege any entity ever demanded full payment from the Estes pursuant to the Mortgage and/or the Note, or pursued judicial action to enforce the same.

---

[2]   The Holts later sold the Property to John and Marie Aronson (the "Aronsons") on or about April 19, 2012.  (Document No. 47, ¶15).

(Document No. 1); see also (Document No. 1-1; Document No. 1-2). The undersigned observes that the Mortgage and the Note include clauses providing: "[i]f all or any part of the Property or any interest in it is sold or transferred . . . without Lender's prior written consent, **Lender may, at its option, require immediate payment in full** of all sums secured by this Security Instrument." (Document No. 1-1, p.6; Document No. 1-2, p.3) (emphasis added).

Despite Ocwen's knowledge by August of 2010 that the Estes had defaulted on their obligations under the Note and the Mortgage, and that the Mortgage was never recorded, Ocwen Financial Corporation ("Ocwen Financial") bid on and won the servicing rights to the loan at issue by November 21, 2012, and then transferred those interests to Plaintiff Ocwen Loan Servicing LLC on or about February 15, 2013. (Document No. 1, ¶¶14-16). Ocwen Financial purchased this asset, and other assets, from bankruptcy proceedings related to GMAC Mortgage LLC ("GMACM"). (Document No. 1, ¶14, n.1).

**B.      Procedural**

Plaintiff filed its "Complaint" (Document No. 1) against Defendants on April 25, 2013 in the United States District Court for the District of South Carolina, Florence Division, alleging professional negligence, negligence, and breach of contract. The Complaint contends that "there exists complete diversity and the amount in controversy exceeds Seventy-Five Thousand Dollars ($75,000)." (Document No. 1, ¶ 4). Plaintiff demands judgment for "all compensatory damages," alleging Defendants "failed to follow the Specific Closing Instructions and failed to comply with industry standard" such that Plaintiff "has not been able to foreclose its interest in the Property or otherwise recover its losses from a title insurer." (Document No. 1, pp.4-9).

In response, Defendants moved to dismiss, or alternatively, for change of venue to the Western District of North Carolina, on June 10, 2013. (Document No. 12). A South Carolina

District Court Judge heard oral arguments on December 9, 2013, and then entered an "Opinion And Order" (Document No. 21) on December 18, 2013 denying without prejudice Defendants motion to dismiss pursuant to Rule 12(b)(1), and allowing for change of venue to this Court. (Document Nos. 20, 21, and 22). The case was transferred the following day. (Document No. 23). The parties consented to Magistrate Judge jurisdiction on February 18, 2014. (Document No. 29). A "Pretrial Order and Case Management Plan" was entered by the Court on February 27, 2014. (Document No. 30).

Plaintiff filed its "Motion for Partial Summary Judgment and Incorporated Brief in Support" (Document No. 47) on February 6, 2015. Also on February 6, 2015, Defendants filed their "Motion to Dismiss Pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure for Lack of Subject Matter Jurisdiction" (Document No. 49), and a "Motion for Summary Judgment" (Document No. 51).

On July 30, 2015, the undersigned held a Status and Motions Hearing. The motions are now ripe for review and disposition.

## II.    STANDARD OF REVIEW

The plaintiff has the burden of proving that subject matter jurisdiction exists. See Richmond, Fredericksburg & Potomac R.R. Co. v. United States, 945 F.2d 765, 768 (4th Cir. 1991). The existence of subject matter jurisdiction is a threshold issue the court must address before considering the merits of the case. Jones v. Am. Postal Workers Union, 192 F.3d 417, 422 (4th Cir. 1999). When a defendant challenges subject matter jurisdiction pursuant to Fed.R.Civ.P. 12(b)(1), "the district court is to regard the pleadings as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." Richmond, 945 F.2d at 768. The district court should apply the standard applicable

to a motion for summary judgment, under which the nonmoving party must set forth specific facts beyond the pleadings to show that a genuine issue of material fact exists. Id. at 768-69. The district court should grant the Rule 12(b)(1) motion to dismiss "only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." Id. See also, Evans v. B.F. Perkins Co., 166 F.3d 642, 647 (4th Cir. 1999).

The parties agree that South Carolina law controls in this case. (Document No. 52, pp.8-9; Document No. 56, pp.6-7). "Under Klaxon v. Stentor Electric Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), a court ordinarily must apply the choice-of-law rules of the State in which it sits." Piper Aircraft Co. v. Reyno, 454 U.S. 235, 244, n.8 (1981). "However, where a case is transferred pursuant to 28 U.S.C. § 1404(a), it must apply the choice-of-law rules of the State from which the case was transferred." Id. (citing Van Dusen v. Barrack, 376 U.S. 612 (1946)). This case was transferred pursuant to 28 U.S.C. § 1404(a). (Document No. 21). Therefore, South Carolina choice-of-law rules apply.

"Under South Carolina choice-of-law principles, the substantive law is determined by the law of the state in which the injury occurred (*lex loci delicti*) and procedural matters by the law of the forum (*lex fori*)." Collins v. R.J. Reynolds Tobacco Co., 901 F. Supp. 1038, 1045 (D.S.C. 1995) (citing Thornton v. Cessna Aircraft Co., 886 F.2d 85, 87 (4th Cir.1989)) aff'd sub nom. Collins v. RJ Reynolds Tobacco Co., 92 F.3d 1177 (4th Cir. 1996). The alleged injury in this case occurred in South Carolina, and therefore, South Carolina substantive law applies.

### III.  DISCUSSION

Defendants seek dismissal of all Plaintiff's claims pursuant to Fed.R.Civ.P. 12(b)(1). (Document No. 49). Defendants contend that "Plaintiff does not have standing to bring this lawsuit, and thus, the Court does not have subject matter jurisdiction over Plaintiff's claims." Id.

## A.     Standing

Standing "is a fundamental component of a court's subject-matter jurisdiction;" a defendant may properly challenge a plaintiff's standing by way of a motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure." Mosely v. Balboa Ins. Co., 5:10-cv-132-RLV, 2013 WL 5938096, at *1 (W.D.N.C. Nov. 5, 2013) (quoting Miller v. Augusta Mut. Ins. Co., 157 Fed. Appx. 632, 635 (4th Cir.2005) ("The concept of standing—which requires that the plaintiff have a sufficiently personal stake in the outcome of the litigation—forms an indispensable part of the Article III case-or-controversy requirement.")); see also Powell ex rel. Kelley v. Bank of America, 379 S.C. Ct. App. 437, 444-45 (Ct.App. 2008).

> "Generally, a party must be a real party in interest to the litigation to have standing." Hill v. S.C. Dep't of Health & Envtl. Control, 389 S.C. 1, 22, 698 S.E.2d 612, 623 (2010) (internal quotation marks omitted). "A real party in interest for purposes of standing is a party with a real, material, or substantial interest in the outcome of the litigation." Id. (internal quotation marks omitted).

>> Rule 17(a) of the South Carolina Rules of Civil Procedure requires that every action be prosecuted "in the name of the real party in interest".... The South Carolina rule with respect to the real party in interest requirement is patterned after the comparable federal rule, which has been regarded as embodying the concept that an action shall be prosecuted "in the name of the party who, by the substantive law, has the right sought to be enforced." It is ownership of the right sought to be enforced which qualifies one as a real party in interest, rather than absolute ownership of specific property.

> 4 S.C. Jur. Action § 23 (1991) (footnotes omitted). "The requirement of standing is not an inflexible one." Sloan v. Sch. Dist. of Greenville Cnty., 342 S.C. 515, 524, 537 S.E.2d 299, 304 (Ct.App. 2000) (internal quotation marks omitted).

<u>Bank of America, N.A. v. Draper</u>, 405 S.C. 214, 220 (Ct.App. 2013). "A real party in interest is one who has a real, material, or substantial interest in the subject matter of the action, as opposed to one who only has a nominal or technical interest in the action." <u>Sloan v. Greenville Cnty</u>, 356 S.C. 531, 547 (Ct.App. 2003) (quoting <u>Charleston County Sch. Dist. v. Charleston County Election Comm'n</u>, 336 S.C. 174, 181 (1999)).

> A nominal party has no personal stake in the outcome of the litigation and is not necessary to an ultimate resolution. <u>Birnbaum v. SL & B Optical Centers, Inc.</u>, 905 F.Supp. 267, 271 (D.Md. 1995). A party is necessary if, in his absence, complete relief cannot be given. <u>Schlumberger Indus., Inc. v. Nat'l Sur. Corp.</u>, 36 F.3d 1274, 1287 (4th Cir. 1994).

<u>Turnamics, Inc. v. Advanced Envirotech Systems, Inc.</u>, 1:98cv274-LHT, 54 F.Supp.2d 581, 585 (W.D.N.C. 1999); <u>see also</u> <u>Dempsey v Transouth Mort. Corp.</u>, 1:99cv124-LHT, 88 F.Supp.2d 482, 484 (W.D.N.C. 1999)

To prove standing a plaintiff must satisfy three elements. <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560 (1992). First, the plaintiff must have suffered an "**injury-in-fact**" - an invasion of a legally protected interest which is "concrete and particularized," as well as "actual or imminent, and not "conjectural" or "hypothetical."[3] <u>Id.</u> Second, there must be "**traceability**" - the injury was caused by the challenged action of the defendant(s) and not the result of the independent action of some third party not before the court. <u>Id.</u> Third, "**redressability**" is required - indicating that it is likely, as opposed to speculative, that the injury will be redressed by a favorable decision. <u>Id.</u> "The party invoking federal jurisdiction bears the burden of establishing these elements." <u>Id.</u> "While each of the three prongs should be analyzed distinctly, their proof

---

[3] An injury-in-fact is "an actual or imminent invasion of a legally protected interest, in contrast to an invasion that is conjectural or hypothetical. An injury in fact gives the victim standing to bring an action for damages." <u>Black's Law Dictionary</u> 1809 (10th ed. 2014).

often overlaps." <u>Friends of the Earth, Inc. v. Gaston Copper Recycling</u>, 204 F.3d 149, 154 (4th Cir. 2000).

> Neither causation nor redressability exists in the absence of an injury-in-fact because both elements rely on the presence of the injury. Without injury, causation is merely action unconnected to any effect. Without injury, redressability lacks either an image by which to determine the nature of the appropriate remedy or a quantity by which to measure how much remediation is due.

<u>Dempsey v. Hoover</u>, 2011 WL 11733600, at *5 (S.C. Ct. App. March 22, 2011).

By the pending motion to dismiss, Defendants argue that Plaintiff does not satisfy *any* of the requirements for standing. (Document No. 50, pp.8-13).

**1.    Injury-in-Fact**

First, Defendants argue that Plaintiff did not suffer an injury-in-fact because "Plaintiff is not the owner of the mortgage nor does it have any interest in the refinanced loan that would cause an injury-in-fact." (Document No. 50, p.9). Defendants assert that the evidence obtained in discovery shows that Plaintiff only had rights to service the Mortgage, as defined by the "Servicing Guidelines." (Document No. 50, p.10) (citing Document No. 50-8). Defendant further asserts that "the servicing rights are not an interest in the mortgage from which an injury-in-fact can arise . . . the "Servicing Guidelines" held by Ocwen are essentially a contract to collect interests in the mortgage owned by Freddie Mac." (Document No. 50, p.10).

Defendants also note that Plaintiff has not provided any documentation showing that the original loan note financed by Parkway Mortgage and assigned to Flagstar Bank was the loan note assigned to Freddie Mac, and Plaintiff has not provided any chain of transfer of interest of the Mortgage itself. (Document No. 50, p.10, n.2).

11

Next, Defendants contend that Plaintiff has identified its damages as "the unpaid principal balance and all consequential damages based on past due interest, fees and escrow items to date." (Document No. 50, p.10). However, Defendants note that Plaintiff, through its representative Katherine Ortwerth ("Ortwerth"), has explained that Plaintiff will remit any proceeds of this lawsuit to Freddie Mac. Id. (citing Document No. 47-13, p.4, ¶11). Thus, Defendants conclude if there is any injury-in-fact, which they deny, it would be to Freddie Mac as the owner of the Mortgage. Id.

Finally, Defendants assert that to the extent Plaintiff argues that its rights in servicing the loan, particularly its right to foreclose on the Mortgage, have been damaged by Defendants -- Plaintiff never had the right to foreclose on the loan as servicer, and since the Property was purchased by a bona fide purchaser, no right to foreclose on the Property existed. (Document No. 50, p.11). When Plaintiff acquired servicing rights on February 15, 2013, the Mortgage had been unenforceable for over seven (7) years. Id.

In response, Plaintiff contends that it does have standing to maintain this action and that "[t]he forecast of evidence analyzed in light of overwhelming case law demonstrates that Ocwen is a real party in interest." (Document No. 55, p.5). Plaintiff identifies several cases it believes support its standing in this matter. (Document No. 55). However, Plaintiff's response does not directly address the elements the parties agree are necessary to support standing. Id. See also Lujan, 504 U.S. at 560.

First, Plaintiff notes that the South Carolina Court of Appeals has affirmed servicers' status as a real party in interest. (Document No. 55, pp.5-6) (citing Bank of Am. v. Draper, 746 S.E.2d 478, 482 (S.C. Ct. App. 2013) (recognizing "servicer of a loan to be a real party in interest and able to initiate a foreclosure").

Next, Plaintiff argues that its standing to prosecute civil actions "is not limited to instances where it seeks to initiate foreclosure or request relief from a bankruptcy stay." (Document No. 55, p.6) (citing <u>BAC Home Loans Servicing, LP v. Texas Realty Holdings, LLC</u>, 901 F.Supp.2d 884 (S.D.Tex. 2012) (loan servicer sued individuals involved in a fraudulent deed of trust avoidance scheme). Plaintiff notes that the court in <u>BAC Home Loans</u> stated that "[c]learly, plaintiff has constitutional standing to bring this lawsuit as its compensation under the [Pooling and Servicing Agreement], in part, is a percentage of the proceeds of the loans it services and defendants alleged actions deprived plaintiff of the opportunity to maximize recovery of those proceeds." (Document No. 55, pp.5-6) (quoting <u>BAC Home Loans</u>, 901 F.Supp.2d at 905).

Plaintiff also notes that the Supreme Court has recognized that "lawsuits by assignees, including assignees for collection only, are 'cases and controversies' of the sort traditionally amenable to, and resolved by, the judicial process." (Document No. 55, p.7) (citing <u>Sprint Commc'ns Co., LP v. APCC Servs., Inc.</u>, 554 U.S. 269, 285 (2008) (quoting <u>Vermont Agency of Natural Resources v. United States ex rel. Stevens</u>, 529 U.S 555 (1992)). Plaintiff contends that the Supreme Court rejected "Sprint's argument that the collection agent lacked standing" and "found there was an injury in fact, and the injury in fact was likely redressable." <u>Id.</u>

In reply, Defendants acknowledge that Plaintiff identifies caselaw supporting the notion that a servicer of a loan may file a foreclosure action against a debtor of a loan/mortgage on behalf of the owner of the loan mortgage based on a servicing agreement. (Document No. 59, p.3) (citing Document No. 55, pp.5-6). But, Defendants assert that "Plaintiff does not cite any caselaw where a servicer initiated a lawsuit on behalf of a subsequent loan/mortgage owner for alleged attorney malpractice involving the original loan/mortgage owner and closing attorney." <u>Id.</u>

Defendants argue that the cases cited by Plaintiff found that the loan servicer had standing because of its pecuniary interest in collecting proceeds from the case. ((Document No.59, p.3) (citing <u>BAC Home Loans</u>, 901 F.Supp.2d at 905). Defendants contend that Plaintiff does not have a pecuniary interest, and therefore, Plaintiff's cases are not applicable. (Document No. 59, pp.3-4). Defendants conclude on the basis of Ortwerth's testimony that if all proceeds of this lawsuit will go to Freddie Mac, then Plaintiff is not the injured party. (Document No. 59, p.3).

At the hearing, Defendants also argued that <u>BAC Home Loans</u> is distinguishable because the rights assigned to the servicer in that case were much broader than the rights assigned here. Defendants contend that the "Servicing Guidelines" here provide that Plaintiff cannot initiate a legal action – other than default legal matters – unless it obtains written approval from the Freddie Mac legal division. <u>See</u> (Document No. 47-13, pp.2-5, 59-66). Defendants note there is no evidence of such approval here.

Defendants further assert that Plaintiff was not damaged by its inability to foreclose on the Mortgage, because "Plaintiff **never even had the right to foreclose** on this loan." (Document No. 59, p.4). Defendants argue that Plaintiff has not provided an assignment of legal claims from the initial mortgage owner Parkway Mortgage to Freddie Mac to Ocwen. (Document No. 59, p.5). Defendants conclude that Plaintiff's failure to establish a chain of rights in the Mortgage, and failure to show any transfer or assignment of any rights Parkway Mortgage may have had as a result of an attorney-client relationship in 1999, mean that Plaintiff has no "legally protected interest that is concrete and particularized" (Document No. 59, p.6). Thus, there was no injury-in-fact, and there is no standing. <u>Id.</u>

Defendants also assert that South Carolina does not allow the assignment of claims arising out of an attorney client relationship. <u>Id.</u> (citing <u>Pavilion Dev. Corp. v. Nexsen Pruett, LLC</u>, 2013

WL 5925732, at *4-9 (S.C.Com.Pl. Oct. 9, 2013) (assignment of a legal malpractice claim void as against public policy) aff'd by (Pavilion Dev. Corp., 2015 WL 4755645 (S.C. Aug. 12, 2015)).

The undersigned observes that at the hearing, Plaintiff's counsel argued that the injury-in-fact to Plaintiff is that it cannot enforce the mortgage and, therefore, cannot collect the balance owed. It appears that Parkway Mortgage assigned an unenforceable mortgage to Flagstar Bank on August 31, 1999. (Document No. 57-6). As noted above, the "Assignment of Mortgage" (Document No. 57-6), executed by Parkway Mortgage officers, identifies the wrong property and clearly lacks any indication that the underlying mortgage was recorded. Id. Plaintiff acknowledges that Estes never owned property at 3405 B Burris Street – the property listed on the "Assignment Of Mortgage" (Document No. 57-6), the "Note" (Document No. 1-2), and the "Loan Closing Instructions…." (Document No. 1-3).

It is unknown exactly what rights were assigned to Freddie Mac, or when that alleged transfer of interest occurred. (Document No. 1, ¶14). However, it is undisputed that Ocwen Financial bid on and purchased the rights to service the Mortgage assigned to Freddie Mac in or about October 2012, and ultimately transferred its interests in the loan at issue to Plaintiff on or about February 15, 2013. (Document No. 1, n.1). At that time, Plaintiff obtained the rights to service a loan purportedly secured by a mortgage that it knew was never recorded. (Document No. 1, p.3). The Complaint specifically states that "[o]n August 6, 2010, Ocwen's foreclosure counsel obtained a title search for the Property, and the search revealed the Mortgage was never recorded." (Document No. 1, ¶16

The Complaint also notes that the "Property has subsequently been transferred to bona fide purchasers for value, and Ocwen *no longer has* an enforceable interest in the Property." (Document No. 1, ¶ 26). Thus, Plaintiff seems to suggest that it *did have* an enforceable interest

before the Property was transferred. However, it is undisputed that Plaintiff did not have any interest in the Property or related transactions until 2013, almost eight (8) years after the Property was sold to the Holts, and two and a half (2 ½) years after "Ocwen's foreclosure counsel obtained a title search" revealing "that the Mortgage was never recorded." (Document No. 1, ¶¶14-16). The undersigned agrees with Defendants that Plaintiff never had an enforceable interest in the Mortgage. Since the Mortgage was never recorded, and there appear to be other errors or inconsistencies related to the August 31, 1999 closing, it is uncertain what, if any, entity ever had an enforceable interest in the Property.

In addition, the undersigned finds that an important distinction between much of the caselaw cited by Plaintiff, and the instant action, is that Plaintiff is not suing to collect against a borrower. Rather, Plaintiff is suing an attorney and law firm for claims entirely based on their alleged failures to fulfill professional responsibilities. (Document No. 1). The undersigned is not persuaded that either Plaintiff or Freddie Mac were in an attorney-client relationship with Defendants. Moreover, the specific terms of Plaintiff and Freddie Mac's "Servicing Guidelines" set out that "[t]he Servicer must take appropriate action to protect Freddie Mac's interest in bankruptcy proceedings in which the Borrower is the debtor or when there is litigation of either a routine or non-routine nature." (Document No. 48-2, p.35; Document No. 50-8, p.5). Both routine and non-routine litigation are then defined as contested actions with "the Borrower." (Document No. 48-2, p.36; Document No. 50-8, p.6).

The "Servicing Guidelines" further provide that a "Servicer may not initiate legal actions on Freddie Mac's behalf or intervene in legal actions on Freddie Mac's behalf, other than for Freddie Mac Default Legal Matters, unless it obtains written approval [] from the Freddie Mac Legal Division." (Document No. 48-2, p.37; Document No. 50-8, p.7). In contrast, <u>BAC Home</u>

Loans addressed the issue of whether a servicer could bring suit in its own name and found that it could based on "broad authority to act alone in performing servicing duties." BAC Home Loans, 901 F.Supp.2d at 908-909 (citing CWCapital Asset Mgmt., LLC, 610 F.3d at 497). Apparently, the courts in both BAC Home Loans and CWCapital found that the servicer had "full" and/or "broad" power to act "alone" pursuant to their pooling and servicing agreement ("PSA"). Id. The undersigned agrees with Defendants that there is no evidence that the applicable "Servicing Guidelines" here are nearly as broad as the PSAs in those cases relied on by Plaintiff.

Plaintiff has not alleged, or forecast any evidence, that it received written approval to initiate this action, or that it is authorized to pursue an action against counsel to an underlying real estate transaction. Plaintiff's counsel argued at the hearing that his corporate representative would say Plaintiff was directed to file this lawsuit by Freddie Mac, but he did not describe any written approval, or whether the "Servicing Guidelines" cover this sort of action. Plaintiff's evidence and cases support a finding that it may initiate actions against a borrower related to a mortgage default, but that is not the case before the Court.

In short, the undersigned is not persuaded that Plaintiff can assert that it was injured when it knowingly obtained the rights to service an unsecured loan/mortgage. In addition, Plaintiff has not adequately demonstrated facts or authority, including the "Servicing Guidelines," that support Plaintiff's standing to bring these claims against these Defendants. The undersigned agrees with Defendants that the cases relied upon by Plaintiff are distinguishable from the instant action.

## 2. Traceability

Next in support of their motion to dismiss, Defendants argue that Plaintiff cannot show traceability. Defendants note that traceability "refers to causation and Plaintiff[] must demonstrate that the injury they have suffered was caused by the challenged conduct of defendants, and not the

independent action of some third party." (Document No. 50, p.11) (citing <u>Lujan</u>, 504 U.S. at 560, and <u>Friends of the Earth, Inc.</u>, 204 F.3d at 154).

Defendants insist that they did not cause Plaintiff's inability to foreclose on the mortgage. (Document No. 50, pp.11-12). Plaintiff acquired servicing rights to an unenforceable mortgage in 2013, more than seven (7) years after the property in question was sold to a bona fide purchaser for value. (Document No. 50, p.12) (citing Document No. 1, ¶14). Defendant concludes that Plaintiff was never the owner of the Mortgage, and never had the right to foreclose on the Mortgage; thus, Plaintiff cannot show traceability and has no standing. <u>Id.</u>

Plaintiff's "…Response In Opposition…" declines to directly address traceability. (Document No. 55). Plaintiff concludes it has standing, but fails to explain the causal connection between its alleged injury and the challenged conduct of Defendants. <u>Id.</u> Plaintiff also fails to address Defendants' argument that Plaintiff actually *never* had a right to foreclose on the Mortgage. <u>Id.</u>

At the hearing, Plaintiff's counsel argued that traceability is satisfied because: (1) they can't enforce the Mortgage because Defendants failed to record it; and (2) there is no other recovery because Defendants failed to get title insurance. Counsel further suggested in oral argument that none of Plaintiff's predecessors in interest were responsible for confirming that the Mortgage was recorded or that there was title insurance.

In reply, Defendants re-assert that Plaintiff cannot now claim that its alleged damages were caused by the actions of attorneys for another party eleven (11) years earlier, where Plaintiff obtained the rights to service an unsecured loan. (Document No. 59, pp.4-5).

The undersigned finds that even if Plaintiff suffered an injury-in-fact, Plaintiff has not adequately demonstrated that its injury was caused by the actions of Defendants without the

independent action of some third party(ies).  See Lujan, 504 U.S. at 560;  Friends of the Earth, Inc., 204 F.3d at 154.

Based on Plaintiff's undisputed facts, as well as the four corners of the original "Assignment of Mortgage" from Parkway to Flagstar, the undersigned is not persuaded there was ever an enforceable mortgage in this matter.  (Document No. 52-6).  The record indicates that on or about the same day as the underlying transaction, August 31, 1999, Parkway Mortgage assigned to Flagstar Bank a mortgage that had not been recorded, and referenced a property the obligees had never owned.  (Document No. 52-6).  As such, Plaintiff is in the difficult position of arguing that it was injured in 2013 by knowingly obtaining rights to service an unsecured and uninsured mortgage, and that the alleged closing attorneys' actions or inaction on August 31, 1999 are the proximate cause of that injury.  See (Document No. 1, pp.3-5).  Plaintiff does not appear to confer any responsibility on Parkway Mortgage to assign a valid mortgage to Flagstar, to Flagstar to subsequently assign a valid mortgage to whatever entity it next assigned the underlying Mortgage to, or to Freddie Mac, GMACC, or Ocwen Financial Corporation to recognize that the underlying Mortgage was never recorded.  As also noted above, Plaintiff has failed to forecast any evidence of the rights that Flagstar Bank purportedly assigned to its successor(s) in interest, particularly Freddie Mac.

In addition, Plaintiff has presented little, if any, argument or evidence regarding the Estes and their obligation to pay.  Plaintiff seems to assert that it is unable to service the Estes loan for Freddie Mac based on Defendants' actions, but has failed to describe any attempt to seek payment from the Estes.  It appears to be undisputed that the Estes were obligated to pay on the Note, regardless of whether or not the Note was secured by a recorded mortgage.  If Plaintiff is unable to service the loan, it is presumably based on the Estes' refusal to pay beginning in or about May

19

2010, not the closing in 1999. The Complaint indicates that the $145,000 loan had been effectively serviced for almost eleven (11) years before the Estes ceased payments. (Document No. 1, pp.2-3). The Estes apparently made timely payments on the loan between 1999 and May 2010, totaling almost $64,000. See (Document No. 50-10) (also referencing 3405 B Burris Street, instead of 3507 Burris Street).

At the hearing, Plaintiff's counsel suggested that the amount due on the Note was "probably enforceable but uncollectible." As noted above, Plaintiff has not explained why the amount due is *probably* uncollectible from the borrower, or whether it has attempted to collect.

It is the undersigned's view that any injury to Plaintiff in 2013 was not proximately caused by Defendants. Plaintiff's factual allegations describing intervening actions of one or more third parties that significantly impacted the alleged injury to Plaintiff are impossible to ignore.

### 3. Redressability

Finally, Defendants contend that even if Plaintiff can meet the other elements of standing, it is unable to meet the element of redressability. (Document No. 50, p.12). Defendant notes that redressability "assures the effectiveness of judicial involvement and Plaintiff[] must show that it is likely, and not merely speculative, that a favorable decision will remedy the injury." Id. (citing Lujan, 504 U.S. at 561, and Friends of the Earth, Inc., 204 F.3d at 154). Defendants again point out that any damages awarded to Plaintiff would be remitted to Freddie Mac. Id. (citing Document No. 47-13, ¶11). "Awarding damages to a Plaintiff who has no interest in the mortgage would not redress the alleged injuries." (Document No. 50, p.13).

In response, Plaintiff argues that "[t]he action does not have to be brought by one who will ultimately benefit from the recovery." (Document No. 55, p.8) (quoting Mitsui & Co. v. Puerto Rico Water Res. Auth., 528 F. Supp. 768, 776 (D.P.R. 1981)). Defendant further states that

> [a]n agent for a disclosed or undisclosed principal may sue for
> damages suffered by the principal and is "a proper plaintiff even
> though the damages were sustained by another, he claims no
> financial interest in the transaction or litigation, and even though he
> did not have title to, or more than a transient possessory or custodial
> interest in, the property forming the subject of the dispute." . . . the
> "inquiry focuses, as it should, on whether the injury that a plaintiff
> alleges is likely to be redressed through the litigation--not on what
> the plaintiff ultimately intends to do with the money he recovers."

Id. (quoting Mitsui & Co., 528 F.Supp. at 776, and Sprint Commc'ns Co., L.P. v. APCC Servs.,
Inc., 554 U.S. 269, 287 (2008)).

Defendants' reply declines to address the cases or arguments Plaintiff contends support
redressability. (Document No. 59).

Based on the foregoing, as well as Plaintiff's uncertainty about how any award from this
lawsuit would be applied, the undersigned is not convinced that Plaintiff has met its burden of
demonstrating that this lawsuit can redress the alleged injury. The Complaint, the briefs, and oral
argument all suggest that Plaintiff's alleged damages are, at most, speculative.

## B.    Privity

During oral argument, as well as in their briefs regarding summary judgment, the parties
have also raised the issue of privity. [4] "'Privity' denotes [a] mutual or successive relationship to
the same rights of property." Fabian v. Lindsay, 410 S.C. 475, 482 (2014) (quoting Thompson v.
Hudgens, 161 S.C. 450, 462 (1931)). Defendants have argued that Plaintiff cannot establish that
it has privity with the underlying transaction or the attorney-client relationship with Defendants,
and for that reason lacks standing. Plaintiff contends that Freddie Mac has a successive

---

[4] Privity is "[t]he connection or relationship between two parties, each having a legally recognized interest
in the same subject matter (such as a transaction, proceeding, or piece or property); mutuality of interest."
Black's Law Dictionary, 1394 (10th ed. 2014).

relationship to the same rights of property that puts it in privity with Parkway Mortgage, and that Plaintiff has privity as a disclosed agent for Freddie Mac.

The parties agree that South Carolina courts equate privity with standing, but disagree on the application of relevant caselaw on this issue. See Fabian v. Lindsay, 410 S.C. at 482 ("South Carolina courts have equated privity with standing."). See also, Maners v. Lexington Cnty. Savings & Loan Ass'n, 275 S.C. 31, 35 (1980) (upholding decision from lower court that appellant had no standing to allege [her claim] because she was not in privity with respondent); Rydde v. Morris, 381 S.C. 643, 650 (2009) ("existing law [ ] imposes a privity requirement as a condition to maintaining a legal malpractice claim in South Carolina"); and Gaar v. N. Myrtle Beach Realty, Co., Inc., 287 S.C. 525, 528 (Ct.App. 1986) ("an attorney is immune from liability to third persons arising from the performance of his professional activities as an attorney on behalf of and with the knowledge of his client").

The undersigned agrees that Fabian is instructive in this matter; however, the undersigned reads the decision as a narrow one, holding only that an attorney is liable to persons identified by either name or status in a will or estate planning document. Fabian, 410 S.C. at 491-92. In Fabian, the court "recognize[d] causes of action both in tort and in contract by a **third-party beneficiary of an existing will or estate planning document** against a lawyer whose drafting error defeats or diminishes the client's intent." Fabian, 410 S.C. at 491 (emphasis added).

Similar to this case, the plaintiff in Fabian had "asserted a tort claim for professional negligence (attorney malpractice) and a claim for breach of contract on behalf of a third party beneficiary." Fabian, 410 S.C. at 480. Plaintiff alleged that a drafting error by her uncle's attorney had mistakenly defeated her uncle's intent and had disinherited her from her uncle's estate. Fabian, 410 S.C. at 480-481. The circuit court in South Carolina granted defendants' motion to dismiss,

finding that the plaintiff was not in privity with defendants, but the Supreme Court of South Carolina reversed and remanded. Fabian, 410 S.C. at 478.

The Fabian decision includes a discussion of privity under existing law that is helpful, including cases cited above. Fabian, 410 S.C. at 482-83. The decision also provides some history of the concept of privity:

> An early case by the United States Supreme Court adopted the concept of privity from an English decision, Winterbottom v. Wright, 152 Eng. Rep. 402 (Exch.) (1842), and applied it to hold an attorney was not liable to a bank that relied on his erroneous certification that his client had good title to land. See Nat'l Sav. Bank v. Ward, 100 U.S. 195, 205–07, 25 L.Ed. 621 (1879) (discussing Winterbottom's limitation of recovery in another context to those having privity of contract). The Supreme Court noted there were exceptions, however, for instances of fraud, collusion, and like circumstances. Id. at 205–06, 100 U.S. 195.
>
> Privity for legal malpractice has traditionally been established by the existence of an attorney-client relationship. See generally Rydde v. Morris, 381 S.C. 643, 650, 675 S.E.2d 431, 435 (2009) (stating "existing law [ ] imposes a privity requirement as a condition to maintaining a legal malpractice claim in South Carolina").

Fabian, 410 S.C. at 482-83. See also, Bergman v. New England Ins. Co., 872 F.2d 672, 675 (5th Cir. 1989) ("A majority of jurisdictions follow the view expressed by the Supreme Court in National Savings Bank v. Ward, . . . that absent fraud, collusion, or privity of contract, an attorney cannot be held liable to a non-client for malpractice").

No language in the Fabian decision suggests to the undersigned that the Supreme Court of South Carolina intended to further expand an attorney's liability beyond the context of a known third party beneficiary to a will or estate. The undersigned respectfully disagrees with Plaintiff's position that the instant case is analogous to Fabian or other will and estates cases.

Even if <u>Fabian</u> is applicable outside the narrow confines of an estate or will claim, it does not appear that pursuant to <u>Fabian</u> Plaintiff was a sufficiently identifiable third-party beneficiary of the 1999 closing. Plaintiff was not specifically named, nor was its status as servicer of the Mortgage identified. It is not disputed that the Mortgage, assuming it was valid, could be assigned, but here, at best, such an interest would flow to Freddie Mac. Plaintiff agreed to service the Mortgage for Freddie Mac, but that is an additional contractual relationship between Freddie Mac and Plaintiff, and there is no evidence that such an agreement connotes privity between Plaintiff and Defendants. While <u>Fabian</u> holds that the plaintiff in that matter was a third-party beneficiary of a will or estate who had standing to assert causes of action for professional negligence (legal malpractice) and breach of contract, it does not appear to suggest that the plaintiff could have further conveyed that interest to another party.

As <u>Fabian</u> suggests, a beneficiary of a will is typically knowable by name or at least by virtue of some definable status at the time the instrument is created by an attorney. Here, Plaintiff's identity and potential interest in the underlying transaction was unknowable to Parkway Mortgage's counsel on August 31, 1999. Certainly the Mortgage anticipates "Lender's successors and assigns," but there is no evidence the Mortgage includes *servicers* of successors and assigns. (Document No. 1-1, p.2). Plaintiff does not contend that it has ownership of the Mortgage itself, only that it is the current servicer. (Document No. 1, ¶14). Moreover, Plaintiff's alleged interest in the underlying transaction did not arise until at least February 2013, and then only after multiple preceding purported assignments and intervening events. (Document No. 1).

Regarding a breach of contract claim by a third-party beneficiary of contract, <u>Fabian</u> provides:

> "Generally, one not in privity of contract with another cannot maintain an action against him in breach of contract, and any damage resulting from the breach of a contract between the defendant and a third-party is not, as such, recoverable by the plaintiff." Windsor Green Owners Ass'n v. Allied Signal, Inc., 362 S.C. 12, 17, 605 S.E.2d 750, 752 (Ct.App.2004) (citation omitted). "However, if a contract is made for the benefit of a third person, that person may enforce the contract if the contracting parties intended to create a direct, rather than an incidental or consequential, benefit to such third person." Id. (citation omitted).

Fabian, 410 S.C. at 488. There is no forecast of evidence that Plaintiff, or any servicer, was intended to be a direct beneficiary of the underlying transaction involving the Estes and Parkway Mortgage and Defendants.

Based on the foregoing, the undersigned is not persuaded that South Carolina law supports a finding of privity between these parties under such extenuating circumstances, particularly regarding claims based on an alleged attorney-client relationship. As such, Defendants' privity arguments further bolster the conclusion that Plaintiff lacks standing to proceed with this action.

## C.    Amount in Controversy

An issue not directly addressed by the parties, but of concern to the Court, is whether the Complaint adequately satisfies the amount in controversy requirement for jurisdiction. The amount in controversy seems to be related to the elements of injury and traceability. Plaintiff's Complaint is not specific about the amount in controversy in this case. (Document No. 1, ¶4). The Complaint merely claims that the amount in controversy exceeds $75,000. Id. Where a complaint seeks damages "in excess" of a certain dollar figure, the party asserting jurisdiction exists must prove by a preponderance of evidence that the amount in controversy requirement is met. See Momin v. Maggiemoo's International LLC, 205 F. Supp. 2d 506, 509 (D.Md. 2002); Gwyn v. Wal-mart, 955 F.Supp.44, 46 (M.D.N.C. 1996).

At the hearing and in its brief, Plaintiff now asserts that it is seeking approximately $174,000 in damages. See (Document No. 55, pp.4) ("Ocwen filed the instant action seeking damages in the amount of the total amount due on the loan, which as of November 18, 2013 was $174,569.29 excluding interest, fees and costs from that date"). The undersigned raised questions at least twice at the hearing about the damages sought, and if awarded, where they would go. Plaintiff's counsel specifically asserted that his client is out approximately $174,000. At the same time, Plaintiff's counsel stated that it is uncertain whether or not Freddie Mac will require Plaintiff to reimburse Freddie Mac for all damages it recovers in this action. At another point in the hearing, Plaintiff's counsel was unclear as to whether Plaintiff was injured solely on the basis of servicing fees it would not receive, or might be liable to Freddie Mac pursuant to a buy back provision.

The undersigned observes that Plaintiff's representative Katherine Ortwerth testified during her deposition that Plaintiff is not the owner of the loan itself, and that Plaintiff submits all proceeds and/or payments from the loan to the owner of the loan, and that Plaintiff gets "servicing fees." (Document No. 52-7, p.2) It has not been explained what, if any, fees Plaintiff might be entitled to related to this case. If Plaintiff is only entitled to servicing fees related to some percentage of the amount due on the loan that it collects, it appears that it is inaccurate to state that Plaintiff has been damaged in excess of $174,000. Even if Plaintiff has suffered an injury, its alleged damages to date appear to have been speculative.

Plaintiff has not alleged what, if any, percentage of damages it would ultimately be entitled to. The undersigned observes that this Court, and other courts have held that "[a] finding of jurisdiction cannot be premised on such speculation." Stockner v. Starwood Hotels, 5:12-CV-013-DCK, 2012 WL 2529414, at *4 (W.D.N.C. June 29, 2012) (quoting Gwyn v. Wal-Mart Stores, Inc., 955 F.Supp. 44, 46 (M.D.N.C. Jan. 30, 1996)).

Plaintiff's uncertainty as to its damages and how any award would be applied raises doubt that the amount in controversy requirement has been met, and further weakens Plaintiff's allegations that it has been injured or suffered a loss based on Defendants' alleged negligence and/or breach.

*     *     *     *

After careful consideration of all the parties' arguments, the undersigned is persuaded that Plaintiff lacks standing in this matter, and thus, the Court lacks subject matter jurisdiction pursuant to Fed.R.Civ.P. 12(b)(1). Moreover, the undersigned is not convinced that Plaintiff has presented any authority that suggests that under South Carolina law a party (Plaintiff) who contracted for servicing rights to a mortgage with an assignee (Freddie Mac), of an assignee (Flagstar), of a mortgagor/lender (Parkway Mortgage), has standing to bring claims for professional negligence, negligence, and breach of contract against attorneys with whom it never had an attorney-client relationship.

## IV.    CONCLUSION

**IT IS, THEREFORE, ORDERED** that Defendants' "Motion to Dismiss Pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure for Lack of Subject Matter Jurisdiction" (Document No. 49) is **GRANTED**.

**IT IS FURTHER ORDERED** that Plaintiff's "Motion for Partial Summary Judgment…" (Document No. 47) is **DENIED AS MOOT**; and Defendants' "Motion for Summary Judgment" (Document No. 51) is **DENIED AS MOOT**.

**SO ORDERED**.

Signed: September 9, 2015

David C. Keesler
United States Magistrate Judge